UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CAROL ARMSTRONG                    :
                                   :
                                   :
v.                                 :        CIV. NO. 3:08CV1615(HBF)
                                   :
                                   :
JOHN POTTER, POSTMASTER            :
GENERAL OF THE UNITED STATES       :
POSTAL SERVICE                     :

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Carol Armstrong, brought this action against her former employer, Postmaster General John E. Potter, alleging that the Postal Service discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), on the basis of her gender and retaliated against her based on her complaint to human resources.  For the reasons that follow, the Postal Service's Motion for Summary Judgment **[Doc. #23]** is **GRANTED.**

STANDARD OF LAW

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-movant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).  If the moving party carries its burden, the party

1

opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." Id. In short, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  A party may not create a genuine issue of material fact simply by presenting contradictory or unsupported statements. See SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may she rest on "allegations or denials" contained in her pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). A self-serving affidavit that simply reiterates the conclusory allegations of the complaint without other support is insufficient to raise a genuine issue of material fact. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

2

discrimination.'" <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary judgment is appropriate even in discrimination cases," <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000), where a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct . . ." <u>Tojzan v. N.Y. Presbyterian Hosp.</u>, 2003 WL 1738993, *4 (S.D.N.Y. March 31, 2003).

Finally, the Second Circuit has recognized that even in fact-specific discrimination cases, summary judgment may be appropriate. <u>Abo-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001). The advantageous purpose of summary judgment - to avoid "protracted, expensive and harassing trials" based upon factually unsupported claims - is at least as relevant in the context of discrimination cases as those involving other ultimate questions of fact, and discrimination claims should not be barred from summary judgment to achieve those ends. <u>Id.</u>; <u>see</u> <u>Celotex</u>, 477 U.S. at 323-24.

<u>BACKGROUND</u>

The following facts are offered by defendant as background facts and are not findings based on the parties' Local Rule 56(a) Statements.

Armstrong was a clerk in the Madison, Connecticut, Post

3

Office.  Madison is a small facility; there is a postmaster and
four clerks.  The postmaster, Debra Richter-Wallace, and two of
the other clerks were women.  The only male was William Mercier,
who was also a clerk.  The carriers who support the Madison Post
Office are located at the Guilford Annex, a facility which
supports the carriers for both Guilford and Madison.

Armstrong alleges that Mercier sexually harassed her in 2006
and 2007.  Although both plaintiff and Mercier continued to be
employed by the Postal Service, they never worked together after
2007 or, at the latest, January 2008, because either Armstrong or
Mercier was out of the office on medical leave or vacation.
Armstrong was hospitalized during January 2008.  On or about
February 12, 2008, she complained to Richter-Wallace about
Mercier's inappropriate behavior.  Armstrong repeated this
complaint to the Postal Service's district office on February 22,
2008.  In response, the Postal Service sent two managers to
interview Armstrong, Richter-Wallace, Mercier and co-worker Beth
Bristol regarding Armstrong's complaint.

Armstrong made contact with the Equal Employment Opportunity
("EEO") on April 8, 2008.  In her complaint to the EEO office,
she alleged only that the Postal Service retaliated against her
after she filed her complaint beginning on March 3, 2008.  She
did not exhaust any of the sexual harassment or gender
discrimination allegations nor did she ever allege sexual

4

harassment or gender discrimination to the EEO.

Except for a brief period in February 2008 when Armstrong worked at Madison while Mercier was on vacation, Armstrong remained out on medical leave the entire year.  Amstrong's allegations of retaliation concern the Postal Service's handling of various items relating to her absence.  During discovery, she identified eleven incidents of retaliation that she claimed are a part of this case.

Armstrong had originally worked in the Deep River Post Office as a letter carrier before position cuts forced her to take a clerk position in Madison.  Because she was cut from the position, under the applicable contract, Armstrong held the right to return to Deep River and she continued to receive her carrier salary throughout her time at Madison.  In mid-2009, Armstrong returned to work at the Deep River Post Office as a carrier.

FINDINGS OF FACT

Based on the parties' Local Rule 56(a) Statements, summary judgment briefs, and the exhibits provided, the following facts are undisputed.

A.  Plaintiff's Work history

Plaintiff has been an employee of the U.S.P.S. ("Postal Service") since 1991.  Doc. #23; Def. 56(a)(1) Stat. ¶1.  In May 2002, Armstrong was working as a letter carrier in the Deep River Post Office.  She was excised, meaning that her position was cut,

5

but she was able to obtain a position in the Madison Post Office as a clerk.  Id. at ¶2.  Armstrong did not work at the Madison Post Office after January 2008.  She remained out of work on sick leave from January 2008 until June 1, 2009.  On June 1, 2009, she was cleared for duty and returned to the Deep River Post Office as a letter carrier.  She was able to return to the Deep River Post Office because she exercised her retreat rights under the union contract.  Id. at ¶3.  Armstrong continued to receive a letter carrier salary during the time that she was working as a clerk.

B.  The EEO Complaint

Plaintiff first made contact with an EEO counselor on April 8, 2008.  Id. at ¶5.  Forty five days prior to April 8, 2008 is February 23, 2008.  Id. at ¶6.  Plaintiff's only allegation in the EEO complaint was retaliation.[1]  Id. at ¶7.  In her formal EEO complaint, plaintiff only checked the retaliation box of the form.  Id. at ¶8.  Plainitff claimed that the retaliation began on March 3, 2008.  Id. at ¶9.  Plaintiff did not allege, and the EEO did not investigate, any claim of gender discrimination or sex harassment.  Id. at ¶11.

---

[1]Plaintiff agrees in part and disagrees in part with defendant's ¶¶ 7-8 stating that the retaliation complaint was made because she had made a sex harassment complaint in February 2008.  This, however, does not alter these paragraphs of the Rule 56(a)(1) statement submitted by the defendants, which only address the contents of the EEO complaint.

During the EEO process[2], Armstrong claimed that she opposed discrimination when, on February 12, 2008, she complained to her Postmaster, Debra Richter-Wallace, that a co-worker, William Mercier, was behaving inappropriately towards her.  Further, Armstrong claimed that on February 22, 2008, she filed a sexual harassment complaint with the Postal Service's district office. Id. at ¶12.  When asked during her deposition about with whom she filed her sexual harassment complaint, Armstrong answered, "I called Hartford personnel and spoke to Vera Eaton Wright of human resources.  Id. at ¶13.  During Armstrong's deposition, she was asked, "And the sexual harassment complaint, that was to human resources, that wasn't to the EEO?" To which Armstrong replied, "Right." Id. at ¶14.  Plaintiff did not work with Mercier after January 2008.  Id. at ¶17.

The sexual harassment complaint was investigated by Marilou Deshais, the District Compliment Coordinator, and Marta Woodward, the Postmaster of Ledyard Post Office.  Id. at ¶15.  The investigation of the sexual harassment complaint occurred in March 2008 and Richter-Wallace, Armstrong, Mercier and Beth Bristol were interviewed by Deshais and Woodward.  Id. at ¶16.

C.   The Allegations of Retaliation

During discovery, the Postal Service asked Armstrong the

---

[2]Employees of the USPS may file civil actions in district court within 90 calendar days of receipt of the EEO decision, in lieu of filing an appeal with the EEOC. 29 C.F.R. § 1614.110.

following interrogatory: "Please identify and describe all acts of discrimination, harassment, or retaliation you claim to be a part of this lawsuit.  For each individual act, please include who committed the act(s) towards you, when the act(s) were committed, and any witnesses to the act(s)."  Id. at ¶18.  In response, plaintiff listed eleven incidents that she alleged were retaliatory.  Id. at ¶19.

DISCUSSION

Plaintiff alleges that the Postal Service subjected her to a hostile work environment in violation of Title VII, on the basis of her gender, and retaliated against her based on her complaint to human resources.

1.   TITLE VII: Disparate Treatment

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To establish a prima facie case of retaliation, the plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." McMenemy v. City of Rochester, 241 F.3d 279, 282-283 (2d Cir.

8

2001).  To meet the first element, the "plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. . . .  Not every act by an employee in opposition to . . . discrimination is protected.  The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual."  Id. at 283.  To meet the third element, that she suffered an adverse employment action, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)(internal quotation marks omitted).  Minor changes in schedules are not considered adverse employment acts, nor are general personality disputes.  Recio v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008).

"An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation." Feingold v. New York, 366 F.3d 138, 152 (internal quotation marks and alterations omitted).  An adverse employment action "may or may not entail economic loss, but there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)(quoting Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994). Plaintiff's burden at this stage of the analysis is minimal.  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001).

"Once a plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its conduct." Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Stern v. Trustees of Columbia University in City of New York, 131 F.3d 305, 312 (2d Cir. 1997)("defendant has the burden of producing, through the introduction of admissible evidence, reasons for its actions, which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.").  If defendant states a neutral reason for the adverse action, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not

10

based in whole or in part on discrimination." <u>Stern</u>, 131 F.3d at
312; <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 150 (2d Cir.
2000).  A neutral reason "cannot be proved to be a 'pretext for
<u>discrimination</u>' unless it is shown <u>both</u> that the reason was
false, <u>and</u> that discrimination was the real reason." <u>St. Mary's
Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in
original).  In other words, the plaintiff must offer proof
"through presentation of his own case and through
cross-examination" that would allow a rational fact finder to
conclude that the proffered reason was not the true reason for
the adverse employment action.  <u>Carlton v. Mystic Transp., Inc.</u>,
202 F.3d 129, 135 (internal citation omitted).

The law "does not prohibit employers from making employment
decisions based on that which an employee considers to be a de
minimis infraction." <u>Foster v. Arthur Anderson, LLP</u>, 168 F.3d
1029, 1035 (7th Cir. 1999).  To show pretext under the <u>McDonnell-
Douglas</u> framework, therefore, the plaintiff must show that the
defendant acted (or failed to act) because it wanted to retaliate
against the plaintiff, not merely that other courses of action
were available or even preferable to the defendant's actions or
inactions.  <u>See</u> <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 515.

The anti-retaliation provision of Title VII was not intended
to be a talisman that wards off all frustrations and discipline.

[A]n employee's decision to report discriminatory behavior
cannot immunize that employee from those petty slights or

11

> minor annoyances that often take place at work and that all
> employees experience . . . and further that personality
> conflicts at work that generate antipathy and snubbing by
> supervisors and co-workers are not actionable. . . .  In
> short, Title VII does not set forth a general civility code
> for the American workplace.

Baptiste v. Cushman & Wakefield, 2007 U.S. Dist. LEXIS 19784,
*27-28 (S.D.N.Y. Mar. 7, 2007).

## A.  Failure to Exhaust

Before the plaintiff may bring an employment discrimination
suit in federal court, the plaintiff must exhaust her
administrative remedies.  "[A] Title VII claimant may bring suit
in federal court only if he has filed a timely complaint with the
EEOC and obtained a right-to-sue letter. . . This exhaustion
requirement is an essential element of Title VII's statutory
scheme . . . and is designed to give the administrative agency
the opportunity to investigate, mediate, and take remedial
action."  Shah v. New York State Dep't of Civ. Serv., 168 F.3d
610, 613-14 (2d Cir. 1999)(citations and internal quotation marks
omitted).  The failure to exhaust administrative remedies in an
employment case is a "precondition" to bringing suit in federal
court, but not a jurisdictional requirement.  Francis v. City of
New York, 235 F.3d 763, 768 (2d Cir. N.Y. 2000).

To properly exhaust a claim, "[a]n aggrieved person must
initiate contact with a Counselor within 45 days of the date of
the matter alleged to be discriminatory or, in the case of
personnel action, within 45 days of the effective date of the

12

action."  29 C.F.R. § 1614.105(a)(1); <u>Dillard v. Runyon</u>, 928 F.
Supp. 1316, 1323 (S.D.N.Y. 1996).  A district court may only hear
Title VII claims that are included within the EEOC charge or are
based on conduct subsequent to the charge which are reasonably
related to those facts alleged in the EEOC charge. <u>Butts v. City
of New York Depart. Of Housing</u>, 990 F.2d 1397, 1401 (2d Cir.
1993).  "When the alleged retaliation is not based on actions
subsequent to the filing of the EEOC charge, the relaxed
exhaustion requirement . . . does not apply." <u>Abraham v. Potter</u>,
494 F. Supp. 2d 141, 151 (D. Conn. 2007).

     Here, the plaintiff's EEO complaint only alleged
retaliation.  56(a)(1) ¶8; Exh. 3.  Armstrong did not allege
discrimination based on gender or sexual harassment in her EEO
complaint.  56(a)1 ¶7.  She only checked the box marked
retaliation and her allegations contained in the body of the EEO
complaint only concerned retaliation.

     The plaintiff first made contact with an EEO counselor on
April 8, 2008.  56(a)1 ¶5. Because she did not allege any hostile
work environment or gender based discrimination claim to the EEO,
she cannot bring suit on that basis in this Court.  <u>Butts</u>, 990
F.2d at 1401.

     The Court finds that any allegations that pre-date February
23, 2008, forty-five days before April 8, 2008, were not
exhausted in a timely manner.  Accordingly, the Court will not

13

consider plaintiff's claims alleging gender discrimination or
sexual harassment.

B.   <u>The Eleven Incidents of Retaliation</u>

     The first incident Armstrong claims to be retaliatory is:
"January, 2008: After the plaintiff's husband [Thomas Armstrong]
confronted Bill Mercier's wife about the inappropriate gifts that
Mr. Mercier had given Ms. Armstrong, Bill Mercier released the
plaintiff's confidential medical records to her co-workers."  <u>Id.</u>
at ¶20.  William Mercier was another clerk in the Madison Post
Office.  <u>Id.</u> at ¶17.  Plaintiff did not work with Mercier after
January of 2008.  <u>Id.</u> at ¶21.  Armstrong did not make her
complaint to the Postal Service, however, until February 12,
2008.  56(a)1 ¶12.  Assuming this incident did occur, the Postal
Service could not have known of Armstrong's protected activity at
the time Mercier released the records because her protected
activity occurred after the time that he allegedly released the
records.  Because Armstrong cannot show that the Postal Service
was aware of her protected activity, she cannot make a prima
facie case to support a claim for retaliation.  <u>See</u> <u>McMenemy</u>,
241 F.3d at 282-83.

     The second incident of retaliation Armstrong claims is:
"January 26-February 26, 2008: Diane Mercier [Bill Mercier's
wife] filed a complaint with Postmaster Susan Billings.  Ms.
Mercier's complaint addressed the phone call from the plaintiff's

14

husband, it alleged harassment and intimidation." Id. at ¶22.
Diane Mercier was a letter carrier in the Guilford Annex, where
the letter carriers for the Madison and Guilford Post Offices are
stationed. Id. at ¶25. Thomas Armstrong called Diane Mercier
while Armstrong was in an inpatient medical facility in January
of 2008. Id. at ¶23. Diane Mercier, therefore, was the
complainant and Thomas Armstrong was the target of the complaint.
Neither Armstrong nor her husband was ever contacted by anyone.
56(a)1 ¶24. There is no evidence that this had any effect on
Armstrong's job. When asked about this incident during her
deposition, Armstrong testified as follows:

> Q:  All right.  Let's back-track now.  And then at some
>     point, Ms. Mercier filed some sort of complaint against
>     him after he called?
> A:  Yes, allegedly.  I don't know if there's a complaint on
>     file with the Postal Service, but I was told that a
>     complaint was made by Deb Richter-Wallace against my
>     husband that Ms. Mercier felt threatened.
> Q:  Okay.  So, you were never contacted by either the
>     police or the Postal inspectors or anything about this?
> A:  No
> Q:  Do you know if your husband was?
> A:  No, he was not.

Id. at ¶24. The Postal Service does not control whether its
employees file complaints with it and plaintiff admits that
nothing ever came of this complaint. 56(a)1 ¶24. The complaint
was apparently set in motion when Armstrong's husband called
Mercier's wife; general personality disputes are not adverse
employment actions. See Recio, 521 F.3d at 940. In this
situation, the Postal Service took no action except to receive

the complaint.

The third and fourth incidents of alleged retaliation are factually related.  <u>Id.</u> at ¶27.  The third incident is: "March 10, 2008: Deb Richter-Wallace refused to send the plaintiff her vacation schedule and leave slip while she was out on FMLA leave."  <u>Id.</u> at ¶26.  The fourth incident is: "March 11, 2008: Deb Richter-Wallace insisted that the plaintiff travel to the Post Office, while on sick leave, in order to fill out her vacation and leave paperwork."  <u>Id.</u> at ¶27.  During Armstrong's deposition, the following colloquy occurred:

> Q:   Okay.  And was she the one who had sent you the leave slips initially - the schedules with the different days, the inconsistent ones?
> A:   Yes.  She said she was not going to send it to me, but after that conversation over the phone, she did send it to me.  She must have spoken to someone about protocol.
> Q:   And so you got them at some point, shortly thereafter that call, I suppose?
> A:   They - the - a schedule was postmarked March 11th.  I did not receive it until March 17th.
> Q:   Okay.
> A:   And it was sent certified mail, and it was not - it was in the mail system on the 11th and not received until the 17th.
> Q:   Okay.  And after you received it, did you have a chance to put in the vacation days that you wanted?
> A:   She did not send me the leave slips along with the vacation schedule.  I called her and told her that I needed the leave slips and she insisted that I do this over the phone.
> Q:   And so were you able to put in your vacation days to her over the phone?
> A:   Reluctantly, I did do it over the phone, but did not feel comfortable having it not in official writing.
> Q:   Okay.  And do you think you did it over the phone around that time period, around March 17th or 18th?
> A:   Uh-hum.
> Q:   Okay.

```
A:   And she did call my home and left a message on my
     answering machine saying that I needed to hurry up so
     that the other folks can choose their second turn
     around.
Q:   Okay.
A:   And I was not given 48 hours to choose.
Q:   Now, the vacation days that you picked, if I'm
     understanding how it all fits together, you would have
     been out - you were still out sick when these vacation
     days would have come around, correct?
A:   I expected to be returned to work.
Q:   No, no, I understand that you expected to, but you were
     still out at that time?
A:   Yes, I was.
```

Id. at ¶28.  During Ms. Armstrong's deposition, she was asked,

"Now ultimately, if I'm remembering correctly, she ultimately

sent them to your home, the slips to your home, correct?" and

Armstrong replied, "Yes, after three to four times of sending the

schedule back and forth with no forms."   Id. at ¶29.  The Court

cannot find any adverse employment act, which is required to

make a prima facie case for the third or fourth alleged incidents

of retaliation.  These alleged incidents of retaliation had no

practical impact on plaintiff's schedule or work conditions at

all.

     Armstrong's fifth, seventh and eighth alleged incidents

concern delays in receiving paychecks.  56(a)1 ¶30.  The fifth

claimed incident of retaliation is: "March 18, 2008: Deb Richter-

Wallace delayed the plaintiff from receiving her paycheck."   Id.

at ¶31.  Armstrong had a conversation with Richter-Wallace on

March 11, 2008, regarding this paycheck and she received it in

the mail on March 18, 2008.  Id. at ¶32.  The seventh alleged

incident is: "April 18, 2008: Deb Richter-Wallace did not send the plaintiff her paycheck." Id. at ¶33.  The eighth claimed incident is: "April 4, 2008: Deb Richter-Wallace did not send the plaintiff her paycheck." Id. at ¶34.  During her deposition, Armstrong testified that she received the paychecks from April 4 and April 18, 2008.  Id. at ¶35.  Although she could not recall the exact dates on which she received the two paychecks, Armstrong testified that it was shortly after her call to the Postal Service to alert them of the problem.  Id. at ¶36. Plaintiff testified during her deposition that the Postal Service worked with her to fix any problems shortly after she contacted the Postal Service about the problem.  56(a)1 ¶36.  Courts in this Circuit have held that a delay in transmitting a paycheck is not a materially adverse action under Title VII.  Miller v. N.Y. City Health & Hosp. Corp., 2005 U.S. Dist. LEXIS 17975, *16-17 (S.D.N.Y. Aug. 23, 2005)(Title VII discrimination and retaliation), aff'd, Miller v. N.Y. City Health & Hosps. Corp., 198 Fed. Appx. 87, 88 (2d Cir. 2006).  Because delays in receiving these paychecks do not constitute adverse employment actions, plaintiff cannot make out a prima facie case of retaliation.

Armstrong claims the sixth incident of retaliation is: "March 19, 2008: Deb Richter-Wallace gave the plaintiff incorrect information about where she was to send her medical documentation

18

to." <u>Id.</u> at ¶38.  Plaintiff testified that she thought Richter-
Wallace simply made a mistake.  56(a)1 ¶39.

> Q:   Okay.  What happened with that?
> A:   I asked where I should be sending my medical
>      documentation, and she gave me 141 Weston Street in
>      Hartford.  And, again, I didn't feel comfortable with
>      her answer, and I called Bob Johnson, and he gave me
>      the correct address, which is 70 Murphy Road in
>      Hartford.
> Q:   Now, why do you think she gave you the incorrect
>      information?
> A:   I don't know.
> Q:   I mean, do you think she was just wrong?
> A:   She's been wrong about a lot of things, so, yes.

<u>Id.</u> at ¶39.  Both the Human Resources department and the Labor
Relations unit were at the address suggested by Richter-Wallace.
56(a)1 ¶40.  Plaintiff immediately cross-checked Richter-
Wallace's information with her union and discovered the correct
address.  56(a)1 ¶39.  As such, Richter-Wallace's mistake had no
effect and, therefore, was not an adverse employment action.
Without an adverse employment action, Armstrong cannot make out a
prima facie case of retaliation.

The ninth and tenth alleged incidents relate to a pre-
disciplinary interview ("PDI") held on October 23, 2008.  The
alleged ninth incident is: "October 10, 2008: Deb Richter-Wallace
required the plaintiff to attend a PDI meeting to discuss her
failure to be available for work.  Ms. Wallace also claimed that
the plaintiff did not submit the proper documentation to the
medical unit."  <u>Id.</u> at ¶41.  Other courts have held that a pre-
disciplinary interview itself is not an adverse employment

19

action, <u>Franklin v. Potter</u>, 600 F. Supp. 2d 38, 69 (D.D.C. 2009); thus notice of a PDI cannot support a cause of action.

The tenth alleged incident includes multiple allegations: "October 23, 2008: Deb Richter-Wallace would not allow the plaintiff to retrieve her personal belongings from the workroom and also failed to provide the plaintiff with a copy of the cash drawer count.  Ms. Wallace also prohibited the plaintiff from attending a pre-meeting conference with her union representative [and] broke confidentiality in regards to her sexual harassment complaint and subjected the plaintiff to a hostile work environment." <u>Id.</u> at ¶42.

First, despite plaintiff's claim that she was not given adequate time to meet with her steward before the PDI, the union steward did not request additional time to meet with Armstrong prior to the PDI.[3] <u>Id.</u> at ¶46.  More importantly, no discipline resulted from the PDI, so whether additional time was needed or not is irrelevant and this incident is not "materially adverse."

Next, plaintiff claims that she was not given her cash drawer count sheet.  The following colloquy occurred during her deposition:

Q:   Okay.  The cash drawer count'  and we talked a little

_____

[3]Plaintiff denies ¶46 but misstates the fact in defendant's 56(a)1 statement by stating that she "requested additional time to meet with a union representative in the parking lot prior to the PDI, but the Postmaster screamed at her and told her she must come in immediately."  Pl.'s Rule 56(a)(2).

```
           bit about this - what would - I guess, I don't
           understand what's the significance of the copy of the
           cash drawer count?
      A:   Well, it has a witness that witnesses anyone that's
           counting your cash, that you are responsible for, to be
           counted in front of them as witness that it's either
           over or short.
      Q:   And if I remember correctly, you said it was over by
           $20?
      A:   Right.
      Q:   Were you disciplined for that?
      A:   No.
      Q:   So, although you didn't get the cash drawer count
           sheet, nothing happened to you as a result of your cash
           drawer?
      A:   Nothing happened to me, but I don't know if it was
           counted with my witness or someone else.
```

Id. at ¶47.  Plaintiff herself stated that "nothing happened" as

a result of the cash drawer sheet; thus, there was no discipline

and this incident cannot be the adverse employment action

required for a prima facie case.

     Next, plaintiff claims that Richter-Wallace would not let

her retrieve her personal belongings.  56(a)1 ¶42.  The following

colloquy occurred during her deposition:

```
      Q:   Okay.  I think we sort of talked about this, but I want
           to make sure we didn't miss anything.  The personal
           belongings, you mentioned this morning when you went
           for the PDI, you wanted to retrieve your personal
           belongings; is that correct?
      A:   Yes.  I had a rain jacket that was on a chair at the
           desk.  I had training records in a cubby that I wanted
           to take with me, and I was not allowed to retrieve any
           of that.  I have asked several times to get them.  She
           told me she was going to send them to the union.  She
           did not do that.  I wrote to the union.  He was going
           to have me go there with another - Carolyn Saunders to
           retrieve my belongings, but I was, again, by doctor's
           orders, not allowed to go into the building.
      Q:   Could Carolyn have gone into the building and gotten
           them?
```

21

A:   She could have, I just wanted to make sure there was
     nothing left behind.  I don't know if -
Q:   Well, let me make sure I understand.  If Deb Richter-
     Wallace had gotten your stuff, she wouldn't have known
     if anything was left behind either, right?
A:   Right.
Q:   So, the only way we could know if nothing was left
     behind was for you to go in there?
A:   Right, or have them sent to the union office, and I
     could have eliminated going there or having Carolyn
     Saunders go there.  It was arranged between Bob Johnson
     and Eileen Kelty that I could go into the office with
     my union rep. and retrieve my belongings.
Q:   But you didn't want to do that?
A:   No.
Q:   Okay.  Did you ever get your belongings back?
A:   I managed to get them back after starting back at the
     Deep River office recently.  I asked the postmaster
     there to call the Madison Post Office because I needed
     that rain jacket to do my job.  And he placed a phone
     call.  Deb is - was apparently out on medical leave,
     after having surgery, and whoever he spoke with that
     was in charge sent them right to the office, no
     problem.

Id. at ¶53.  However, Ms. Armstrong's doctor would not allow her
to go back into the Madison Post Office.  56(a)1 ¶53.
Ultimately, Ms. Armstrong did receive these items.  Pl.'s Depo.
135:3 - 136:20.  Accordingly, the Court does not find the delay
in retrieving her belongings to be an adverse employment action
that supports a claim of retaliation.

     Plaintiff's last allegation of the tenth incident of alleged
retaliation is that Richter-Wallace breached confidentiality in
regards to plaintiff's sexual harassment complaint.  56(a)1 ¶42.
Defendant argues that this claim fails for three reasons.  First,
the investigators had already interviewed Armstrong, Richter-
Wallace, Mercier (the alleged harasser) and Armstrong's co-

worker, Beth Bristol.  56(a)1 ¶16.  Thus, in a facility of one
post-master and four clerks, the investigation can hardly be said
to have been confidential at that point.  Second, defendants
argue that the audience at the PDI must be considered.  The only
people at the PDI were Richter-Wallace, Armstrong, Armstrong's
union representative Carol Saunders, and Al Rauccio, the
Postmaster of the Old Saybrook Post Office.  56(a)1 ¶48.  Rauccio
was present as a management witness and Saunders was present to
represent Armstrong.  56(a)1 ¶52.  Everyone at the PDI was a
person in a position to know the results of the human resources
investigation.  The Court agrees with the defendant and finds
that the disclosure of the results of the investigation in such a
setting is not something that would dissuade a reasonable person
from opposing discrimination and is not an adverse employment
action that supports a claim for retaliation.

        The eleventh claimed incident of retaliation is: "December
23, 2008: Deb Richter-Wallace did not scan or sign for a
certified letter which confirmed the plaintiff's notification of
a medical absence."  Id. at ¶55.  During her deposition,
Armstrong was asked about this letter.  The following colloquy
occurred.

    Q:  After that, did you do it [advise the medical unit of
        status] every 30 days?
    A:  I did it every 30 days.  I sent it certified return
        receipt to my postmaster, that my status had not
        changed.  In December of '08, she did not - I sent one,
        she did not - it was never accepted at the unit as

                                23

        certified.  It was never scanned and the return receipt
        was never returned to me.
   Q:   Did you get the letter back, though?
   A:   No.
   Q:   Okay.  Were you ever disciplined for not sending one in
        December?
   A:   No, because I had followed up with USPS.com into the
        inquiry of that letter, and it had been received.

Id. at ¶56.  Because the plaintiff's medical information was
received by the Postal Service, the alleged mishandling did not
impact her and the Court finds that the mishandling of a letter
was not an adverse employment action.

     The plaintiff has the burden of showing that a "reasonable
employee" would have found the challenged action materially
adverse.  On this record, the Court cannot find, as a matter of
law, that any of the eleven incidents Ms. Armstrong asserts were
adverse employment actions, or within a category of actionable
harm described in Burlington Northern.

2.   New Claims Raised in Plaintiff's Opposition to Summary
     Judgment

     In plaintiff's Memorandum in Opposition to Defendant's
Motion for Summary Judgment [Doc. #27], she raises two claims for
the first time.  First, she alleges that the postal service
retaliated against her by "unreasonably delaying the
investigation of her complaint about William Mercier's behavior
in the workplace."  Pl.'s Br. 7.  Second, plaintiff contends that
no one advised her of her retreat rights.  Pl.'s Br. 7-8.

     In her discovery, plaintiff was asked, "Please identify and

                              24

describe all acts of discrimination, harassment, or retaliation you claim to be a part of this lawsuit.  For each individual act, please include who committed the act(s) towards you, when the act(s) were committed, and any witnesses to the act(s)."  Ex. 5 pg. 2.  In response, plaintiff created three lists, entitled "Discrimination," "Harassment," and "Retaliation."  Ex. 5, pg. 2-4.  In the discrimination section, plaintiff listed the following incidents: "March 11, 2008: Ted Gonnan, Eileen Kelty, Vera Eaton Wright and Anna Schubert, all members of Upper Management that failed to provide a timely response to the plaintiff's sexual harassment complaint."  Although plaintiff categorized this claim in the discrimination section, the Court will review it on the merits.

The Postal Service's report of investigation shows that Theodore N. Goonan sent a letter to plaintiff on July 11, 2008 stating,

> I have been advised by the Postmaster of the Madison Post Office that you are currently out on sick leave.  We have finished the Management Investigation and would like to share the findings with you.  When you are able to return to work please call my office to make arrangements so we can share this information with you.

Ex. 8, pg. 3.  On August 19, 2008, Eileen Kelty sent plaintiff a letter about the investigation.  It stated,

> I have recently taken over the 064 offices, which include the Madison Post Office.  As you are aware the Management Investigation has been completed, however, the findings have not been shared with you because I understand that you are

25

out on sick leave.  When you are able to return to work,
please call my office to schedule an appointment so we can
share this information with you.  It is important that you
call to make an appointment so I can set aside the time to
share this information with you.[4]

Ex. 8, pg. 4.

This evidence shows that the Postal Service attempted to
contact the plaintiff and share the results of the investigation
within five months of the incident.

Plaintiff does not say how the timing of the report or any
delay in its disclosure to her affected her employment.
Defendant argues that it did not impact the time she remained out
of work; the investigation concluded that there was no sexual
harassment, and plaintiff did not return to work after the report
was issued.  The Court agrees that the timing of the
investigation was not "materially adverse," nor would it have
"dissuaded a reasonable worker from making or supporting a charge
of discrimination."  Burlington Northern, 548 U.S. 53, 68.
Accordingly, the alleged delay in completing or disclosing the
investigation report was not an adverse act that supports a claim
for retaliation.

Plaintiff's second claim is: "When a mail carrier position
opening was anticipated, and then realized at the Deep River post
office due to a retirement, no one at the District level (for

_____

[4]The contact telephone number in both letters has been
redacted.

26

example, Vera Eaton-Wright of Human Resources) advised the
plaintiff of her retreat rights; she was only offered the
position after she heard about it informally and contacted the
President of the Mail Carrier's Union."  Pl.'s Br. 7-8.  This is
the first time plaintiff raises this issue.  It was not alleged
in her complaint.  Doc. #1.  It was not disclosed in her
interrogatory responses or her discovery responses which were
certified on March 31, 2009 or any supplemental discovery
responses.  Ex. 5, pg. 3-6, 12; <u>See</u> Fed. R. Civ. P.37(c)(1).

"A summary judgment opposition brief is not a substitute for
timely motion to amend the complaint."  <u>Maharishi Hardy Blechman
Ltd. v Abercrombie & Fitch Co.</u>, 292 F. Supp. 2d 535, 544
(S.D.N.Y. 2003).  Courts have consistently held that a new
allegation is "inappropriate for the first time in submissions in
opposition to summary judgment."  <u>Mutts v. S. Conn. State Univ.</u>,
2006 U.S. Dist. LEXIS 46707, *22 (D. Conn. Jun. 28, 2006) <u>aff'd</u>,
242 Fed. Appx. 725, 2007); <u>Beckman v. United States Postal Serv.</u>,
79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000).  Moreover, "leave to
amend a complaint will generally be denied when the motion to
amend is filed solely in an attempt to prevent the Court from
granting a motion . . . for summary judgment, particularly when
the new claim could have been raised earlier."  <u>Beckman</u>, 79 F.
Supp. 2d at 408.

Plaintiff has not moved to amend her complaint.

Accordingly, the Court will not consider plaintiff's new claim based on the failure to transfer her to Deep River before she raised the issue with her union.

CONCLUSION

Accordingly, defendant's Motion for Summary Judgment [Doc. #23] is **GRANTED.**

SO ORDERED at Bridgeport this 21st day of June 2010.

```
_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
```